**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **LATUNJA JOHNSON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:15-cv-02371-RDP** |
| | } | |
| **CITY OF BESSEMER, ALABAMA, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

**MEMORANDUM OPINION**

## I.    Introduction

The events which form the basis of this action are truly tragic.  Plaintiff's decedent, Sheneque Proctor was at a Bessemer hotel and consumed Xanax, cocaine, and methadone.  As a result, she died of a drug overdose.  What is even more tragic is that Proctor, a young woman and a mother, died alone in a jail cell, yet another victim of a destructive drug abuse epidemic gripping our nation and its communities.  Defendants are five jailers who were working at the Bessemer City jail on the night and morning in question.  Plaintiff has asserted a deliberate indifference to serious medical need claim against them pursuant to 42 U.S.C. § 1983.  (Doc. # 36 at ¶ 49).

This matter is before the court on the Motion for Summary Judgment filed by Defendants Goodwin, Jones, Tamper, Caram, and Burch (collectively "Defendants").  (Doc. # 43).  The motion is fully briefed.  (Docs. # 43, 50, 51).  Faced with the tragedy of Proctor's death, and the claims asserted in this case which followed it, the court evaluates the liability of the individual Defendants under the prevailing constitutional standards for deliberate indifference claims.

## II.     Relevant Background and Facts[1]

On November 1, 2014, Bessemer police were dispatched to the Economy Inn in Bessemer.  (Doc. # 44-1 at p. 2).  They had received a report of a female causing a disturbance.  (*Id.*).  When officers arrived at the Economy Inn, they encountered Proctor.  (*Id.*).  Proctor was upset because she had been staying at the Economy Inn and money of hers had gone missing.  (*Id.*).  An officer offered to write a report for theft (or loss) of the money, but Proctor refused, and only became "louder and more irate."  (*Id.*).  Officers warned Proctor that if she did not calm down she would be arrested for disorderly conduct. (*Id.*).

When officers informed Proctor that the Economy Inn wanted her off its premises, Proctor "got in the officers' faces" and continued yelling about her money.  (*Id.*).  At that point, an officer grabbed Proctor's arm to pull her back from the other officers.  (*Id.*).  When Proctor pulled away and started flailing, the officers put her under arrest, put her in handcuffs, and walked her to the back seat of a police cruiser to take her to jail.  (*Id.*).  Proctor slipped out of her handcuffs twice during the ride to the jail.  (*Id.*).

When the arresting officers arrived at the jail, they opened the back door of the police cruiser to speak to Proctor.  (*Id.* at p. 3).  Proctor refused to cooperate with the officers, and instead tried to get out of the car and walk past the officers.  (*Id.*).  One of the officers deployed a burst of OC spray in Proctor's face.  (*Id.*).  Only then were the officers able to handcuff Proctor

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party.  *See Info Sys. & Networks Corp. v City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts that could be established through live testimony at trial.  *See Cox. v. Admr. U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Included in this statement of facts is a synopsis of the facts known to each Defendant individually.  The court presents the facts in this manner because, when assessing claims such as those presented here, the Eleventh Circuit has made clear that "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008).

again. (*Id.*). Because Proctor refused to walk from the police cruiser to the jail, the officers carried her into the jail and handcuffed her to the jail bench. (*Id.*). After carrying Proctor into the jail, one of the arresting officers, Officer Kinderknecht, returned to the police cruiser and found a small bag of marijuana on the back seat along with Proctor's phone and jewelry. (*Id.*).

Because Officer Kinderknecht deployed his OC spray while attempting to subdue Proctor, he completed an OC Spray Interview Form. (*See* Doc. # 44-3). The form requires the officer who deployed the OC spray to read certain instructions to the individual who was sprayed with the OC spray. (*Id.*). As directed by the form, Officer Kinderknecht gave the following instruction to Proctor:

> OC is non-toxic and the effects will dissipate in a short time. The effects of OC may however, mask or cover other medical conditions, including overdoses of certain drugs.

(*Id.*). Officer Kinderknecht also instructed Proctor as follows:

> I am going to ask you (4) questions for your safety. Not answering my questions, withholding information, or giving false o[r] misleading answers could delay medical treatment and may seriously jeopardize your health and safety.

(*Id.*). Then, Officer Kinderknecht asked Proctor, "[a]re you currently under the influence of, or have you taken cocaine, amphetamines, barbiturates, PCP, opiates, heroin, or alcohol within the last eight (8) hours?" (*Id.*). Proctor refused to answer this question. (*Id.*). He then asked Proctor, "[d]o you have heart problems, lung problems, diabetes, high blood pressure, or any other serious medical conditions?" (*Id.*). Again, Proctor refused to answer. Officer Kindknecht suspected that Proctor was under the influence of some substance, but he did not witness Proctor take any drugs. (Doc. # 44-2 at pp. 20, 50).

## A.     Defendant Goodwin

Defendant Goodwin, as a member of the "B-Watch," began her shift at 2:00 p.m. on November 1, 2014.  (Doc. # 44-6 at p. 31).  When she arrived at the jail, approximately ten minutes before her shift was to begin, Goodwin saw the arresting officers struggle to place handcuffs on Proctor in the jail's parking lot. (*Id.* at pp. 31-32).  When Goodwin entered the jail to start her shift, Proctor was handcuffed to the jail bench outside the jail bars.  (*Id.* at p. 32).  As part of the intake process, Goodwin tried to obtain certain information from Proctor, including her name.  (*Id.* at p. 33).  However, Proctor cursed and spat at the police officers and jail staff and refused to give her name.  (*Id.* at pp. 33-37).

Eventually, Proctor calmed down enough that Defendants Goodwin and Mullins were able to take her handcuffs off.  (*Id.* at p. 36).  From there, Goodwin and Mullins led Proctor to the back of the jail where she cleaned up and dressed out in a jail uniform.  (*Id.* at pp. 36-38).[2] Goodwin then took Proctor to a single person cell.  (*Id.* at pp. 44-45, 49; Doc. # 44-7, Jail Surveillance Video at 13:22:26).  Goodwin took Proctor to this cell because Proctor had been combative when she came to the jail, and Goodwin did not want Proctor to cause any trouble with the other inmates.  (*Id.*).  Goodwin believed that Proctor was high on some drug based on her behavior, but Proctor did not appear unsteady on her feet and her speech was normal.  (*Id.* at pp. 49-50).

Shortly after Goodwin placed Proctor in her cell, another inmate called out to Goodwin and said that Proctor was "ready to talk."  (*Id.* at p. 117).  At that point, Goodwin let Proctor out of her cell.  (*Id.*; Doc. # 44-7, Jail Surveillance Video at 13:37:38).  Proctor apologized for how

---

[2] After being sprayed with the OC spray, Proctor went through the "decontamination" process.  As part of the decontamination, Proctor went to the sink and rinsed her face off.  (Doc. # 44-6 at pp. 38, 43).  Proctor did this by herself, without the assistance of the correctional officers.  (*Id.* at pp. 38-39).

she had behaved and asked to use the phone. (*Id.*). Goodwin told Proctor that she could use the phone once she had been booked in. (*Id.*). Proctor complied with the booking process, and Goodwin took Proctor's picture and recorded her personal information. (*Id.*).

After Proctor had been booked in, she made a phone call to her mother in which she asked her mother to bond her out, asked about her baby, and mentioned that she had been sprayed by the arresting officers. (*Id.* at pp. 145, 148). During her booking and phone call, Proctor was cooperative and did not seem "out of it." (*Id.* at p. 148). After Proctor's phone call, Goodwin returned Proctor to her cell. (*Id.* at p. 142; Doc. # 44-7, Jail Surveillance Video at 14:00:45).

Goodwin next interacted with Proctor at 4:44 p.m., when she entered Proctor's cell to serve her dinner. (*Id.* at p. 100; Doc. # 44-7, Jail Surveillance Video at 15:44:57). Goodwin entered Proctor's cell to find Proctor sitting on the side of her bed, with her back hunched over and her head in her hands. (Doc. # 44-7, Jail Surveillance Video at 15:44:57). Apart from breathing, Proctor did not otherwise move or respond to Goodwin's entry into her cell. (*Id.*). Goodwin walked over to Proctor and touched her on the left shoulder. (*Id.* at 15:45:06). While she continued breathing, Proctor did not respond. (*Id.*). Goodwin then tugged twice at Proctor's left shoulder. (*Id.* at 15:45:08-14). While Proctor's head and torso moved slightly from the force of the tug, she did not otherwise respond to Goodwin's attempts to rouse her. (*Id.*). Goodwin grabbed Proctor by both shoulders and laid her down on the bed. (*Id.* at 15:45:14-27). Goodwin then lifted one of Proctor's legs off of the floor and placed it on the bed in a laying position. (*Id.* at 15:45:27-40). Again, while Proctor continued to breath, she did not make any other response to Goodwin's efforts to lay her down in her bed. (*Id.*). An inmate stood near the doorway of Proctor's cell during this interaction, and appeared to watch Goodwin attempt to

rouse Proctor and subsequently lay her in her bed. (*Id.* at 15:45:00-40). After laying Proctor

down, Goodwin briefly left her cell and returned to place a cup on Proctor's food tray, which

Goodwin had placed on a piece of furniture near the foot of Proctor's bed. (*Id.* at 15:50:25-36).

Goodwin entered Proctor's cell again at 5:39 p.m. to check on her. (*Id.* at 16:39:18). At

that time, Goodwin walked through Proctor's cell to the head of her bed to check on Proctor.

(*Id.* at 16:39:20-28). Proctor was in the same position in which Goodwin had left her – lying

down with her right leg hanging over the side of the bed. (*Id.*). Goodwin did not testify that she

observed Proctor move her body (outside of the typical movement associated with breathing)[3],

but the jail's surveillance video shows Proctor move her left arm slightly in an upward direction

while Goodwin stood over her. (*Id.* at 16:39:26, 30). Goodwin entered Proctor's cell two more

times, at 8:38 p.m. and 9:27 p.m. to check on her. (*Id.* at 19:38:45; 20:27:54-29:03). On both

occasions, Proctor was in the same position as she had been since Goodwin first placed her on

her bed, and, apart from her breathing, did not move when Goodwin entered the room. (*Id.*).

During her check of Proctor which began at 9:27 p.m., Goodwin retrieved a blanket and covered

Proctor with that blanket. (*Id.* at 20:28:04-58).

Proctor was breathing each time Goodwin checked on her. (Doc. # 44-6 at pp. 59, 103,

104, 111, 153). Moreover, at some point during Goodwin's shift, Proctor began snoring.[4] (*Id.* at

---

[3] "Q. Okay. Other than breathing, do you claim you ever saw [Proctor] move from the moment you found her slumped over? A. I don't remember." (Doc. # 44-6 at p. 103).

[4] The morning after Proctor died, an inmate at the Bessemer City Jail gave the following account to the Alabama State Bureau of Investigation:

> On Nov[ember] 1st, Ms. Proctor came in around 1:30 in the afternoon. She was awake for a couple of hours. Ms. Goodwin came in and brought her tray around 4:00 p.m. – 4:30 p.m. and she was asleep. She didn't wake to eat. Around 9:30 p.m. – 10:00 p.m. the rest of the inmates were locked down. She was still sleeping and snoring. I went to sleep around 11:00 p.m. – 11:30 p.m. and she was still snoring then. I was up around 4:00 a.m. to serve breakfast and Ms. C. [Defendant Monica Caram] opened her cell to give her her tray and we noticed the she wasn't breathing[,] and Ms. C. called 911.

p. 67).  Proctor's snoring was loud, and she was still snoring when Goodwin left at the end of her shift.  (*Id.* at p. 72).  At some point during Goodwin's shift, one of the inmates told Goodwin that Proctor stated she had been taking Xanax bars.  (*Id.* at p. 69).

### B.    Defendant Jones

Defendant Jones first encountered Proctor around the start of his shift, at 2:00 p.m. on November 1, 2014.  (Doc. # 44-4 at pp. 12-13).  Around that time, Jones was standing with another correctional office, Sergeant Mullins.  (*Id.* at p. 10).  Mullins brought Proctor from the outside bench into the jail.  (*Id.* at pp. 10-11).  Mullins asked Proctor if she had been taking anything -- an apparent reference to drugs -- and Jones heard Proctor answer that she had taken "everything."  (*Id.* at pp. 12-14).  Jones then heard Mullins ask if Proctor wanted medical assistance.  (*Id.* at pp. 60-61).  Proctor responded that she did not, and that she just needed to use the phone.[5]  (*Id.* at p. 61).

Proctor "appeared to be irate and uncooperative" during the course of this interaction. (*Id.* at p. 25).  However, her behavior was not otherwise out of the ordinary, and she did not appear to Jones to be high or having any difficulty with her balance.  (*Id.* at pp. 13-15, 18, 31). Jones next observed Proctor when she came out of her cell to use the telephone, and he noted that Proctor had calmed down and appeared "good to go" at that time.  (*Id.* at p. 61).

---

On Nov[ember] 1st between 4:30 p.m. and 9:30 p.m. she was in her cell asleep.

(Doc. # 44-8).

[5]  Q. Did Ms. Mullins ask [Proctor] if she wanted to go see the doctor?  A. Yes, sir.  Q. And what did Ms. Proctor – what was her response?  A. "No.  I need the phone."

….

Q. No. I need – A. "No. I need the damn phone."  But then Ms. Mullins asked her, "Do you want the paramedics?  I'm trying to see if you" – "No, I don't.  I just need to use the phone."

(Doc. # 44-4 at p. 61).

Jones' only other interaction with Proctor came during jail checks. He performed one jail check on the female side of the jail.[6] (*Id.* at pp. 11, 20; Doc. # 44-5). During this check, Jones looked into Proctor's cell. (*Id.* at p. 11). He saw that she was breathing, and that her chest and stomach were rising up and down. (*Id.*). Moreover, he heard Proctor snoring during this jail check. (*Id.* at p. 20).

### C.    Defendant Tamper

Defendant Tamper assisted with booking Proctor into the jail. (Doc. # 44-10 at p. 20). At that time, Proctor was angry. (*Id.* at pp. 20-21). During the booking process, Tamper did not know that Proctor had been sprayed with OC spray. (*Id.* at p. 21). As part of the booking process, Tamper completed a Bessemer Police Department medical questionnaire form. (*See* Doc. # 44-11). Tamper asked Proctor a series of medical questions, and both Tamper and Proctor signed the bottom of the form using an electronic pad. (*Id.*; Doc. # 44-10 at p. 23). When asked whether she was using any street drugs, Proctor only indicated that she was using "weed." (Doc. # 44-11).

Tamper did not perform any jail checks of Proctor's cell during his shift on November 1, 2014. (*See* Doc. # 44-5). However, Tamper did observe Proctor on the video monitor on one occasion. (Doc. # 44-10 at p. 20). At that time, Proctor was lying down and appeared to be asleep. (*Id.* at pp. 20, 45). Tamper left the jail when his shift ended at 10:00 p.m. (*Id.* at p. 16).

### D.    Defendant Caram

As a member of the C-watch, Defendant Caram began her shift at 10:00 p.m. on November 1, 2014. (Doc. # 44-12 at p. 13). When Caram began her shift, she spoke with Goodwin. (*Id.* at p. 14; Doc. # 44-6 at p. 129). At that time, Goodwin informed Caram that

---

[6] In his deposition, Defendant Jones stated that this check occurred between 5:00 p.m. and 5:30 p.m. on November 1, 2014. (Doc. # 44-4 at p. 11). Defendant Jones indicated this check on the jail log by marking his initials next to the time 17:50. (Doc. # 44-5 at p. 2).

"there was a female in [cell] D2 that came in combative and was upset most of the shift." (Doc. # 44-12 at p. 14). Moreover, Goodwin told Caram that an inmate had previously informed her that Proctor had supposedly taken Xanax and that she (Goodwin) had been keeping an eye on Proctor during her shift.[7] (Doc. # 44-6 at p. 129-30).

Caram performed checks on the female side of the jail at 11:30 p.m., 12:17 a.m., 12:53 a.m., 2:00/1:00 a.m.[8], 2:22 a.m., and 2:51 a.m. (*See* Doc. # 44-5). Caram heard Proctor snoring at various times throughout the night, but could not recall a specific time when she last heard Proctor snoring. (Doc. # 44-12 at pp. 37-39). Caram did not try to wake or get a response out of Proctor during the jail checks. (*Id.* at pp. 71-72). Unless she notes a "reason to be concerned," Caram does not attempt to wake up inmates who are asleep until breakfast. (Doc. # 44-12 at pp. 26-28).

When Caram was serving breakfast, she called out Proctor's name, but Proctor did not answer her. (*Id.* at p. 24). At that point, Caram entered Proctor's cell, and called her name out again a few more times. (*Id.*; Doc. # 44-7, Jail Surveillance Video, 4:04:55). When Proctor did not respond, Caram shined her flashlight on Proctor's chest to see if Proctor was breathing. (*Id.*). Caram could not see if Proctor's chest was moving, so she moved her shirt to see if she could see any movement from her skin. (Doc. # 44-12 at p. 24). Seeing no movement, Caram called for paramedics, who arrived on the scene at 4:11 a.m. (*See* Doc. # 44-13). Proctor was pronounced dead at the scene. (Doc. # 44-9 at p. 9). The coroner determined that Proctor died of a polydrug overdose of methadone, cocaine, and alprazolam (Xanax). (*Id.* at pp. 9-10).

_____

[7] In her deposition, Caram testified that Goodwin never told her that Proctor had consumed Xanax. (Doc. # 44-12 at pp. 14-16). However, this dispute of fact, as all others, is resolved in favor of Plaintiff for purposes of Defendants' motion for summary judgment.

[8] There was a time change for daylight savings time on November 2, 2014 at 2:00 a.m. (*See* Doc. # 44-5, reflecting the time change). The above listed jail check times are indicated on the jail log by Caram's initials – "MC" or "MLC").

### E.    Defendant Burch

As a member of C-watch, Defendant Burch began his shift at 10:00 p.m.  (Doc. # 44-14 at p. 17).  Burch performed jail checks on the female side of the jail at 10:25 p.m., 11:00 p.m., 12:53 a.m., 1:53 a.m., and 3:37 a.m.  (*See* Doc. # 44-5).  Around 4:00 a.m., Burch went to serve breakfast.  (Doc. # 44-14 at pp. 25-26).  He placed Proctor's tray in her window where she could access it and yelled out to Proctor to inform her that it was breakfast time.  (*Id.* at p. 26).  When Proctor did not respond, Burch told Caram that he knocked on the Proctor's cell and did not get a response.  (*Id.*).  From there, Caram went to check on Proctor.  (*Id.*).  During his shift, Burch was not aware that Proctor had ingested any drugs. (*Id.* at pp. 31, 47).[9]

## III.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323.  Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

---

[9]  Specifically, Burch testified that he did not hear other inmates talk about Proctor using drugs (Doc. # 44-14 at p. 47) and he did not recall Caram telling him that Proctor consumed any drugs (*id.* at p. 31).

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gariulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson v. Liberty Lobby, Inc.*, teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## IV.    Analysis

Plaintiff's Second Amended Complaint asserts a single claim against each of the individual Defendants in this action – deliberate indifference to serious medical needs. Defendants have moved for summary judgment on the basis of qualified immunity.

### A.    Qualified Immunity

Defendants each raise the defense of qualified immunity. Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity utilizes an "objective reasonableness standard, giving a government agent the benefit of the doubt unless her actions were so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed them." *GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1366 (11th Cir. 1998). The Eleventh Circuit has cautioned that, "[b]ecause qualified immunity shields government actors in all but exceptional cases, courts should think long and

hard before stripping defendants of immunity." *Lassiter v. Ala. A&M Univ., Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994). "We generally accord . . . official conduct a presumption of legitimacy." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 179 (1991).

The court determines whether a defendant is entitled to qualified immunity by engaging in a three-step analysis. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1136-37 (11th Cir. 2007). The initial burden is on the official claiming qualified immunity to establish that he was acting within his discretionary authority. *Id.* Upon that initial showing, the burden shifts to the plaintiff to show that the "defendant's conduct violated a statutory or constitutional right." *Id.* at 1136-37 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Finally, "the plaintiff must show that the violation was 'clearly established.'" *Id.* at 1137; *Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1328 (11th Cir. 2003) ("When case law is needed to 'clearly establish' the law applicable to the pertinent circumstances, we look to decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state." (citing *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1032-33 n.10 (11th Cir. 2001) (en banc)). If Defendant Officers can establish that they are entitled to qualified immunity, then the federal, individual capacity claims will be dismissed. *See Randall*, 610 F.3d at 714.

**B.      Deliberate Indifference**

Plaintiff contends that Defendants were deliberately indifferent to his serious medical needs in violation of section 1983. The Eighth Amendment prohibits cruel and unusual punishment, which includes deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Claims of deliberate indifference to serious medical needs arise under the Eighth Amendment when the claimant is a convicted prisoner. However, when a section 1983 Plaintiff is a pre-trial detainee, the claim must be asserted under the Fourteenth

Amendment. *Gilmore v. Hodges*, 738 F.3d 266, 271 (11th Cir. 2013). In any event, the minimum standard required by the Fourteenth Amendment for providing medical care to a pretrial detainee is identical to the minimum standard required by the Eighth Amendment in the case of a convicted prisoner, so courts analyze these claims in the same manner. *Id.*

"Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference." *Adams v. Poag*, 61 F.3d 1537, 1543-44 (11th Cir. 1995) (citing *Carswell v. Bay Cnty.*, 854 F.2d 454, 457 (11th Cir. 1988); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985)). However, not every claim of inadequate medical treatment states a cognizable claim under the federal constitution. *Id.* "Medical treatment [is deliberately indifferent] only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (citation omitted) (Eighth Amendment case). To establish that a jail official was deliberately indifferent to his serious medical need, a prisoner must meet both an objective and a subjective standard of proof.[10] *Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999).

---

[10] In her response brief, Plaintiff argues that only an objective standard should apply when evaluating this action. (Doc. # 50 at p. 12). The Supreme Court, in *Kingsley*, held that the "appropriate standard for a pretrial detainee's *excessive force* claim is solely an objective one." *Kingsley v. Hendrickson*, 135 S. Ct. 2446, 2473 (2015) (emphasis added). While Plaintiff acknowledges that *Kingsley* only addressed the standard required in excessive force claims, she contends the reasoning of *Kingsley* applies equally to other claims by pretrial detainees, including deliberate indifference claims. (Doc. # 50 at p. 13).

However, before *Kingsley* was decided, the Supreme Court stated that both subjective and objective standards apply to deliberate indifference claims. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (addressing a deliberate indifference claim raised under the Eighth Amendment). And the Eleventh Circuit has established that the same standard applied to Eighth Amendment claims applies to Fourteenth Amendment claims made by pretrial detainees. *Burnette*, 533 F.3d 1325, 1330 (11th Cir. 2008). Moreover, this Circuit has consistently required that subjective and objective standards must be met in order to establish a deliberate indifference claim, and this has not changed following the *Kingsley* decision. *See Howell v. Unnamed Defendant*, 672 F. App'x 953, 955 (11th Cir. 2016); *Lindley v. Birmingham, City of Alabama*, 652 F. App'x 801, 805-06 (11th Cir. 2016). The court is bound to apply the law as stated by the Supreme Court and this Circuit. *Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir. 1997).

To establish the objective component, a prisoner is required to show both (1) an objectively serious medical need that, if left unattended, poses a substantial risk of serious harm, and (2) that the response by the prison official to that need was poor enough to constitute an unnecessary and wanton infliction of pain. *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal quotation marks omitted). In "delay in treatment" cases, even when treatment is ultimately provided, deliberate indifference may be "inferred from an unexplained delay in treating a known or obvious serious medical condition." *Harris v. Coweta Cnty.*, 21 F.3d 388, 394 (11th Cir. 1994).

To establish the subjective component, a prisoner must establish three factors: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) that the conduct complained of is more than merely negligent. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Additionally, as with any tort claim, the prisoner must show that an injury was caused by the defendant's wrongful conduct. *See Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995). It is not enough to show that the care provided was less than optimal, or that a different course of treatment might have been preferable. The required subjective elements of a deliberate indifference claim ensure that "mere accidental inadequacy, negligence in diagnosis or treatment, [and] even medical malpractice" are not actionable under section 1983. *Taylor*, 221 F.3d at 1258. A prisoner also cannot establish a violation simply because he "may have desired different modes of treatment" than that which was provided to him. *Hamm v. DeKalb County*, 774 F.2d 1567, 1576 (11th Cir. 1985). Such a course of treatment claim, by definition, involves

the "exercise of professional judgment" and as such is not actionable. *Estelle*, 429 U.S. at 105.

The parties agree that there is a relative dearth of closely analogous case law. (*See* Doc. # 50 at p. 17 ("cases involving unconscious inmates are relatively uncommon"); Doc. # 51 at p. 10 (agreeing with the characterization of facts such as those presented in this action as "uncommon")). However, this Circuit has rendered decisions in cases which involve facts similar to those presented here.

In *Burnette*, the father of a detainee, Buster Burnette, who died of a polydrug overdose in custody brought a § 1983 action against sheriff's deputies and jailers. *Burnette v. Taylor*, 533 F.3d 1325 (11th Cir. 2008). Burnette was arrested based on his stepfather's report that Burnette had broken into his home and stolen prescription Duragesic patches that his stepfather used to treat chronic back pain. *Id.* at 1327. Burnette's stepfather further told a sheriff's deputy that he thought Burnette was "strung out" on pills and other drugs. *Id.* at 1328. Burnette was arrested. *Id.* At the time of his arrest, Burnette had glassy eyes and dilated pupils, his responses to questions were slow, and he had a bottle of prescription pills in his possession. *Id.* One of the two deputies who made the arrest testified that it was apparent that Burnette was "under the influence of something." *Id.*

After detention, a jailer dressed Burnette out. *Id.* The jailer found a prescription pill bottle in Burnette's underwear, and observed Burnette stagger while changing clothes. *Id.* Burnette's stepfather called the jail and asked the jailers to search Burnette for the missing Duragesic patches. *Id.* The jailers searched Burnette a second time, but did not find any patches on Burnette's body. Burnette was eventually placed in the general population of the jail. *Id.* at 1329. Another inmate carried Burnette's mattress, and his cellmates testified that he was unable to walk on his own, and that the jailer who brought Burnette to the cell asked one of the

cellmates to make sure Burnette got over to the bed without falling. *Id.* A jailer entered Burnette's cell later that evening to check on the inmates, and heard Burnette "laughing and talking." *Id.* Burnette approached a jailer and asked to move to another cell so that he could be with his friends. *Id.* The jailer agreed, and an inmate helped carry Burnette's things to the other cell. *Id.* One of his cellmates testified that at that point Burnette's eyes "were barely opened and like rolling behind his head." *Id.* At midnight, a jailer conducted a head count, and noticed that Burnette was lying on his mat and talking. *Id.* At the 1:00 a.m. head count, Burnette was lying on his mat snoring. *Id.* At the subsequent head counts throughout the night, a jailer observed Burnette lying on his mattress. *Id.*

Burnette was found dead that morning. Burnette's death was caused by a polydrug overdose, and he was found to have taken Alprazolam, Hydrocodone, Benzoylecgonine, and Fentanyl[11] prior to his death. *Id.* at 1329-30. The court held that none of the Defendants, based on the information available to them at the relevant times, deliberately ignored a serious medical condition that was obvious or known to him.[12] *Id.* at 1332. The court reasoned that "[t]he Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol," and instead a defendant must be indifferent to a readily apparent medical need beyond mere intoxication in order violate the constitution. *Id.* at 1333.

This reasoning has consistently been applied in other cases decided by courts in this Circuit. *See Presley v. City of Blackshear*, 650 F. Supp. 2d 1307 (S.D. Ga. 2008), *aff'd*, 340 F.

---

[11] Fentanyl is the drug found in Duragesic patches. Investigators later learned that Burnette had eaten one or more of the Duragesic patches -- which are intended to be placed on the skin for time-released pain relief -- prior to his arrest. *Burnette*, 533 F.3d at 1330 n. 3.

[12] In the alternative, the court "readily conclude[d]" that the law was not clearly established that what any of the defendants did would violate federal law. *Id.* at 1333 n.7.

App'x 567 (11th Cir. 2009) (finding no deliberate indifference where the decedent smelled of alcohol and had "glassy eyes," and certain defendants witnessed the decedent appear to swallow something during his arrest, but did not provide the decedent medical attention until he began shaking badly and hit his head on the floor later that night); *Sanders ex rel. Estate of Sanders v. City of Dothan,* 671 F. Supp. 2d 1263 (M.D. Ala. 2009), *aff'd sub nom. Sanders v. City of Dothan*, 409 F. App'x 285 (11th Cir. 2011) (finding no deliberate indifference where officers did not immediately seek medical attention for an arrestee who appeared to swallow cocaine during arrest, and instead waited until the decedent appeared "dazed" and in medical distress before calling paramedics); *Letson v. Mitchell*, 2015 WL 1487731, at *8 (N.D. Ala. Mar. 30, 2015) (finding no deliberate indifference where officers had to carry the decedent to their car during his arrest due to his intoxication, and provided him no medical treatment despite the fact that he had to be carried into court two days later due to his deteriorated condition resulting from alcohol withdrawal).

### i. Defendant Goodwin

As noted above, a plaintiff pursuing a deliberate indifference claim must establish the existence of a "serious medical need" which was either diagnosed by a physician, or "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow*, 320 F.3d at 1243. A plaintiff pursuing a deliberate indifference claim must not only meet an objective burden of proof, but must also show that a defendant had a subjective knowledge of a risk of serious harm. *Burnette*, 533 F.3d at 1330. On her motion for summary judgment, Defendant Goodwin has met her burden of establishing that there is no genuine issue as to any material fact and that she is entitled to judgment as a matter of law.

### a.      Objective Burden of Proof

Again, to establish the objective component of the relevant test, a prisoner is required to show both (1) an objectively serious medical need that, if left unattended, poses a substantial risk of serious harm, and (2) that the response by the prison official to that need was poor enough to constitute an unnecessary and wanton infliction of pain. *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). A review of the Rule 56 record demonstrates that there is no genuine dispute of fact as to these elements.

"No liability arises under the Constitution for an official's failure to alleviate a significant risk that he should have perceived but did not…. As such, imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." *Burnette*, 533 F.3d at 1331 (internal quotation marks and citations omitted). Viewed from an objective lens, Goodwin observed the following. She witnessed Proctor exhibit hostile and aggressive behavior when Proctor first arrived at the jail. While Goodwin suspected Proctor was high on some drug, Proctor was neither unsteady on her feet nor speaking with slurred words. Goodwin received an apology from Proctor, and guided Proctor through the booking process, at which point Proctor was cooperative and did not seem "out of it." Goodwin next found Proctor in her cell, and was unable to wake her. Goodwin then checked on Proctor multiple times during the evening and found Proctor breathing during each jail check.

While at some point during her shift an inmate told Goodwin that Proctor had taken Xanax bars, Goodwin had no indication of the amount of Xanax which Proctor had taken, let alone that Proctor may have taken a lethal dosage. Moreover, there is no evidence that Goodwin had any knowledge that Proctor had taken cocaine and methadone in addition to Xanax. During their interactions, Proctor never indicated to Goodwin that she needed medical assistance. And,

none of the inmates who observed Proctor reported that she needed any sort of medical assistance.[13]

Of course, "[t]he Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol." *Burnette*, 533 F.3d at 1333. That the evidence, when viewed in a light most favorable to Plaintiff, establishes that an inmate told Goodwin that Proctor had taken Xanax, and that Proctor appeared high when she arrived at the jail, is not enough to rescue Plaintiff from summary judgment. In her briefing, Plaintiff contends that "a jury can conclude Goodwin was aware of an obvious risk" based on her inability to rouse Proctor, and the fact that Proctor did not move from the awkward position in which Goodwin laid her. (Doc. # 50). However, the Rule 56 evidence does not establish a genuine dispute of material fact as to this issue.

To be clear, to avoid summary judgment, the Rule 56 evidence must demonstrate a dispute that there existed (1) an objectively serious medical need that, if left unattended, poses a substantial risk of serious harm, and (2) that the response by the prison official to that need was poor enough to constitute an unnecessary and wanton infliction of pain. *Taylor*, 221 F.3d at 1258. And, in order to constitute a serious medical need, the condition must be so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Farrow*, 320 F.3d at 1243.

Here, the Rule 56 evidence may well provide a genuine dispute of fact regarding whether Proctor was unconscious for some of the time for which Goodwin supervised her. After careful review of the Rule 56 record, it is simply unclear if Proctor lost consciousness before dying, and

---

[13] To the contrary, when Rachel Dodson, an inmate, gave a statement the following day she reported that Proctor was "sleeping" throughout the afternoon and evening. (Doc. # 44-8 ("she was asleep," "she was still sleeping and snoring," and "she was still snoring.")). While Dodson's characterization of her subjective impression of Proctor is certainly not dispositive, it is evidence which informs the court's inquiry regarding whether Proctor objectively presented symptoms of a serious medical need.

if so, when that happened. The coroner's report does not identify a specific time at which Proctor died and does not independently come to a conclusion regarding whether Proctor lost consciousness at some point during her time at the jail. (*See* Doc. # 44-9 at p. 9 ("[D]ecedent reportedly lived for over 12 hours after beginning her incarceration with the decedent having reportedly been asleep and snoring loudly during the majority of this time.")). Goodwin and others reported hearing Proctor snoring while she was in her cell. And, the jail surveillance video indicates that Proctor moved her left arm up and down repeatedly during the minutes leading up to one of Goodwin's jail checks.[14] (*See* Doc. # 44-7, Jail Surveillance Video, 16:23:13-16:39:00). But, the jail surveillance video also shows Goodwin attempt to rouse Proctor, and shows that at that time Proctor did not respond to Goodwin's touch. Thus, it is possible that Proctor was sleeping heavily when Goodwin brought her dinner and could not wake her. Conversely, it is possible that Proctor was unconscious for some of the time she was under Goodwin's supervision. However, the question for purposes of Defendants' motion is not whether there is a genuine issue of material fact as to whether Proctor became unconscious during her time at the jail. Rather, the question (which cannot be answered in the affirmative) is whether there is a genuine dispute that Proctor faced a serious medical condition which was so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

The Rule 56 evidence related to Goodwin does not show the existence of an objectively serious medical need such that a genuine dispute of material fact exists. Goodwin was told that Proctor had taken Xanax, and while Proctor was coherent (albeit aggressive) when she entered the jail, Goodwin later found Proctor on her bed during an afternoon jail check. At that point and after, Proctor may have been asleep, or may have been unconscious. The evidence on this matter

---

[14] The Rule 56 record provides no reason to believe that any of the Defendants witnessed this movement. Accordingly, the court has not credited any Defendant with knowledge (under objective or subjective standards) of this movement. Instead, the court makes this note only to emphasize the ambiguity in the Rule 56 record.

is simply ambiguous.  "Mere incidents of negligence or malpractice do not rise to the level of constitutional violations."  *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).  And, no constitutional violation exists where the evidence is unclear as to whether the plaintiff has suffered an injury at all.[15]  Here, there is no evidence that the Proctor suffered an injury so obvious that a lay person would easily recognize the need for a doctor's attention.[16] Accordingly, there is no evidence which shows that Goodwin was deliberately indifferent to an objectively serious medical need.

### b.      Subjective Burden of Proof

Even if Goodwin were not entitled to summary judgment based on the objective component (and to be sure, she is), she is nonetheless entitled to summary judgment because there is no evidence that she subjectively perceived a serious medical need to which she was indifferent.  Again, to establish this subjective component, Plaintiff must show three factors: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) that the conduct complained of is more than merely negligent. *McElligott*, 182 F.3d at 1255.

Here, Goodwin repeatedly testified that she believed that Proctor was sleeping, and not unconscious, throughout her shift.  (Doc. # 44-6 at pp. 63, 79, 111, 130, 152-53).  Of course, given this testimony, Plaintiff is unable to provide direct evidence which contradicts Goodwin's characterization of her mental processes.  However, Plaintiff may rely on circumstantial evidence

---

[15]  To be clear, Proctor died at some point before breakfast during her time in jail.  This certainly constitutes an injury.  However, to the extent Plaintiff relies on argument that Proctor became *unconscious* before dying of a polydrug overdose, the evidence is unclear.

[16]  Here, the evidence that is *not* in the Rule 56 record may be as informative as the evidence which is found in it.  There is no Rule 56 evidence that Proctor was nauseous or vomited during her time at jail.  There is no Rule 56 evidence that she lost her balance or experienced seizures.  And there is no Rule 56 evidence that her breathing was irregular while she lay in her bed at the jail.  Simply put, there is no Rule 56 evidence that Proctor exhibited many of the "telltale" signs of drug overdose.  Of course, this does not mean that Proctor was not faced with a medical emergency at some point while jailed.  Obviously, she was.  But it does indicate that that Proctor did not present symptoms of a *readily apparent* medical emergency.  *See Presley*, 650 F. Supp. 2d at 1310-11 (drug overdose became apparent when decedent began "shaking real badly" and "hit his head on the floor").

that would tend to discredit Goodwin's testimony regarding her mental impressions. Here, the Rule 56 evidence presents no genuine dispute with regard to Goodwin's subjective impressions.

Goodwin testified that she had no medical training prior to this incident. (*Id.* at p. 25). Moreover, she testified that she did not know what effects Xanax has on those who take the drug. (*Id.* at p. 130). Further, Goodwin testified that her past experiences caused her not to be alarmed about Proctor's condition. Goodwin testified that her son is a heavy sleeper, and at times he won't move when she tries to wake him. (*Id.* at pp. 78-79). Moreover, Goodwin testified that she is aware of a "regular" inmate who is "always drunk" when she comes into the jail, and that inmate sleeps in a similar position to the one she found Proctor in in this case. (*Id.* at pp. 53-54).

The jail surveillance video provides further evidence in support of Goodwin's position that she did not subjectively perceive Proctor to be in need of medical attention. As shown on the video, several inmates walked by Proctor's open cell during the time which Plaintiff argues that Proctor was "obviously unconscious," including during the time when Goodwin attempted to rouse Proctor. (Doc. # 44-7, Jail Surveillance Video, 15:44:00-15:51:00). However, there is no evidence that any of those inmates sought help for Proctor, or otherwise behaved as if there were a medical emergency. Instead, the Rule 56 record reflects only that inmates heard Proctor snoring at various times and thought she was asleep. (*See* Doc. # 44-8; Doc. # 44-9 at p. 9).

A final piece of circumstantial evidence supports (rather than calls into question) Goodwin's testimony that she believed that Proctor was asleep in her cell. Near the end of her shift, Defendant Goodwin returned to Proctor's cell and covered her with a blanket. (Doc. # 44-7, Jail Surveillance Video, 20:27:54-20:29:03). This supports the inference that Goodwin subjectively believed that Proctor was sleeping, rather than unconscious and in need of medical

attention.  Accordingly, Goodwin is entitled to summary judgment for the additional reason that there is no Rule 56 evidence suggesting she subjectively perceived any serious medical need.

### c.    Qualified Immunity

Even if Goodwin's conduct amounted to a constitutional violation (and to be sure, it does not), she would nonetheless be entitled to qualified immunity because she did not violate clearly established law.  That is, even assuming Goodwin's conduct violated Proctor's rights, it must be shown that that right was "already clearly established in such a particularized way to make obvious the conclusion for all reasonable, similarly situated jail officials that what [Defendant Goodwin was] doing violated [Proctor]'s federal rights under the circumstances."  *Purcell v. Toombs County, Ga.*, 400 F.3d 1313, 1319 (11th Cir. 2005).

> [A]n official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay. This general statement of law ordinarily does not preclude qualified immunity in cases involving a delay in medical treatment for a serious injury. The cases are highly fact-specific and involve an array of circumstances pertinent to just what kind of notice is imputed to a government official and to the constitutional adequacy of what was done to help and when. Most cases in which deliberate indifference is asserted are far from obvious violations of the Constitution.

*Bozeman v. Orum*, 422 F.3d 1265, 1273–74 (11th Cir. 2005) (internal citations omitted) *abrogated on other grounds by Kingsley v. Hendrickson*, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015).  Given the fact-specific nature of the deliberate indifference inquiry, and the Rule 56 record in this case, the court readily concludes that the law was not already clearly established, on November 1, 2014, that Defendant Goodwin's conduct would violate federal law.

The law has long been established that officials violate federal law when they delay providing an inmate with access to medical treatment, knowing that the inmate has an urgent medical condition that would be exacerbated by delay.  *See Lindley v. City of Birmingham*, 652

Fed. Appx. 801, 807 (11th Cir 2016); *Valderrama v. Rousseau*, 780 F.3d 1108, 1121-22 (11th Cir. 2015). However, the Rule 56 evidence does not present such a situation here.[17] As addressed above, the evidence with respect to the exact nature of Proctor's condition during Defendant Goodwin's shift is unclear. Given such a situation, it was not clearly established that Defendant Goodwin's conduct violated federal law. Accordingly, Defendant Goodwin is entitled to qualified immunity.

### ii.     Defendant Jones

In her briefing, Plaintiff argues that the remaining Defendants[18] are liable, at least in part, on the basis of Defendant Goodwin's knowledge of Proctor's condition. Specifically, Plaintiff contends that Defendants work closely together in a small jail, and that they pass information along from one shift to the next. (Doc. # 50 at p. 18). Accordingly, she argues that "[w]hile no one other than Goodwin will [admit to] knowing that Proctor was non-responsive and being watched to see if she stopped breathing, a reasonable jury can conclude all of the officers on B and C Watch knew Proctor's situation and did nothing." (*Id.* at p. 19).

However, "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference… . Each individual Defendant must be judged separately and on the basis of what that person knows." *Burnette*, 533 F.3d at 1331. While Plaintiff would have the court assume each Defendant knew what Goodwin knew about Proctor, the Rule 56 evidence tells a different story. With the exception of Defendant Caram[19], there is no Rule 56 evidence that any of the other Defendants spoke with Defendant Goodwin about Proctor before her death. (*See*

---

[17] Indeed, the parties recognize that the facts presented here are in many ways unique. (*See* Doc. # 50 at p. 17; Doc. # 51 at p. 10).

[18] Defendants Jones, Tamper, Caram, and Burch.

[19] Defendant Caram's interaction with Defendant Goodwin is addressed below.

Doc. # 44-4 at p. 16; Doc. # 44-10 at p. 9; Doc. # 44-14 at pp. 45-46; Doc. # 44-6 at p. 70).

Plaintiff has pointed to no dispute of fact which would permit the court to assume that these Defendants knew everything about Proctor that Goodwin knew. While Plaintiff would have the court consider the Defendants' consistent testimony that they did not speak with Goodwin about Proctor "convenient lack of recollection and knowledge regarding Proctor's situation," she provides no Rule 56 evidence to support that contention. As such, the court will not engage such an assumption on the lone basis that it may have happened, given the size of the jail and the Defendants' practice of relaying different information to each other between shifts.

The Rule 56 record indicates that Defendant Jones overheard Proctor state that she had taken "everything." However, Jones then heard Proctor state that she did not want medical assistance, and instead wanted to use the phone. Moreover, Jones did not perceive Proctor to be high or have any difficulty with her balance. Apart from being irate and uncooperative, Proctor's behavior was otherwise ordinary. When Jones performed a jail check on Proctor's cell, he noted that she was breathing and snoring.

Presented with these facts, the court concludes that Jones has met his burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. As addressed above, "[t]he Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol." *Burnette*, 533 F.3d at 1333. The Rule 56 evidence indicates that Jones had reason to believe that Proctor had taken some form of drugs or alcohol. However, the Rule 56 evidence does not indicate that Jones had any reason to believe that Proctor had ingested a lethal amount of drugs. *Id.* at 1332. While Jones heard Proctor state that she had taken "everything," she did not exhibit any symptoms which were indicative that

medical attention was required. *See id.* at 1331. Accordingly, there is no Rule 56 evidence which would suggest that Jones, based on the evidence objectively available to him, would have known of a medical need "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow*, 320 F.3d at 1243.

Moreover, even if Jones were not entitled to summary judgment based on the objective component (and to be sure, he is), he is nonetheless entitled to summary judgment because no evidence has been presented that he subjectively perceived a serious medical need to which he was indifferent. In addition to the facts noted above, Jones testified that he was not concerned when Proctor said that she had taken "everything" because in his experience "a lot" of inmates will tell jail staff similar things with hopes of getting out of the jail building. (Doc. # 44-4 at pp. 15, 23). He also testified that he did not think that Proctor needed medical attention when she arrived at the jail (*Id.* at p. 14), and he thought she was sleeping the one time that he performed a jail check on the female side of the jail and saw her. (*Id.* at p. 11). Plaintiff has pointed to no Rule 56 evidence which would demonstrate that Jones was subjectively aware that Plaintiff had a serious medical need. Accordingly, summary judgment is appropriate here because the undisputed evidence does not show deliberate indifference by Jones to either an objectively serious medical need or one that he subjectively perceived.

Finally, Jones argues that he is entitled to qualified immunity. As discussed above, Plaintiff has failed to present evidence establishing a constitutional violation. Accordingly, Jones is further entitled to judgment as a matter of law on the basis of qualified immunity on Plaintiff's section 1983 deliberate indifference claim.

### iii. Defendant Tamper

The Rule 56 evidence shows that Defendant Tamper encountered Proctor when she first came into the jail when she was angry. He also observed her calm down and become more cooperative. The record shows that, during the booking process, Proctor admitted to using "weed." But, there is no record evidence that Tamper was aware that Proctor had taken any amount of Xanax, cocaine, or methadone. Similarly, there is no evidence that Tamper performed any jail checks during the time Proctor was incarcerated. Tamper only saw Proctor once on the video monitor, and she was lying down at that time.

There is no record evidence that Tamper was deliberately indifferent to an objectively serious medical need. There is no Rule 56 evidence that Tamper had reason to believe that Proctor was under the influence of any drug besides "weed" at the time when she was in the jail. And, while Tamper viewed Proctor on the video monitor once during his shift, she appeared to be lying down at that time. Again, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." *Burnette*, 533 F.3d at 1331. Based on the evidence which Tamper observed, nothing about his actions (or inaction) shows any deliberate indifference to an objectively serious medical need.

Moreover, Plaintiff has failed to provide any evidence that Tamper subjectively perceived a serious medical need. As compared to certain other individual Defendants, Tamper had relatively little interaction with Proctor. From these interactions, Plaintiff has not pointed to any record evidence which suggests that Tamper was subjectively aware that Plaintiff had a serious medical need that required medical attention.

And, as with the other Defendants, Tamper argues that he is entitled to qualified immunity. As discussed above, Plaintiff has failed to present evidence establishing a

constitution violation.  Accordingly, Tamper is entitled to judgment as a matter of law on the basis of qualified immunity.

### iv.    Defendant Caram

When Defendant Caram began her shift, Defendant Goodwin told her that Proctor came into the jail combative.  Goodwin also told Caram that an inmate had informed Goodwin that Proctor had supposedly taken Xanax.  Goodwin further informed Caram that she had been keeping an eye on Proctor during her shift.  From there, Caram performed a number of jail checks throughout the night.  Proctor was snoring at various times through these checks, and otherwise appeared to be asleep.  When Caram was serving breakfast, she called out Proctor's name, but Proctor did not respond.  Caram went to check on Proctor, and determined that Proctor was not breathing.  At that point, Caram called for paramedics, who arrived on the scene shortly thereafter.

On this record, there is no evidence that Caram was deliberately indifferent to an objectively serious medical need.  While Goodwin informed Caram that Proctor had taken Xanax, there is no Rule 56 evidence which would indicate (1) the amount of Xanax which Proctor consumed or (2) that she had taken cocaine and methadone in addition to Xanax. Without record evidence that Caram knew that Proctor had taken an amount of Xanax which could be potentially life threatening, Caram is protected from liability by *Burnette*.  *See Burnette*, 533 F.3d at 1333.  *See also Sanders ex rel. Estate of Sanders,* 671 F. Supp. 2d at 1271. Moreover, the record contains no evidence that something happened during her jail checks of Proctor (prior to breakfast) which would have alerted Caram to an objectively serious medical need.  There is no evidence suggesting that Proctor exhibited any signs of distress, and the Rule 56 record reflects that Proctor lay in her bed snoring much of the night.  When Caram was faced

with an objectively serious medical need -- Proctor lying in her bed and not breathing -- she immediately called paramedics to attend to Proctor. Nothing about Caram's actions or inaction shows any deliberate indifference to an objectively serious medical need.

As with the previously discussed Defendants, Plaintiff also cannot point to any record evidence that Caram subjectively perceived a serious medical need to which she was indifferent. Caram testified that Proctor snored during her shift, and that as far as Caram knew, Proctor was sleeping normally. (Doc. # 44-12 at pp. 67-68). Plaintiff has pointed to no circumstantial evidence which might suggest that Caram had in fact subjectively perceived that Proctor was in some form of physical distress. Accordingly, summary judgment is appropriate in favor of Caram because the Rule 56 record does not show that Caram exhibited deliberate indifference to a medical need which she subjectively perceived.

Finally, Caram is also entitled to qualified immunity. As addressed above, there is no Rule 56 evidence which would establish that Caram was deliberately indifferent to a serious medical need.

### v. Defendant Burch

There is no Rule 56 evidence which indicates that Defendant Burch was aware that Proctor had consumed any drugs. Instead, the record only shows that Burch began his shift at 10:00 p.m. and performed a number of jail checks on the female side of the jail. As part of these checks he looked into Proctor's cell. He did not notice a problem until breakfast, when he yelled out to Proctor to inform her that it was breakfast time, and she did not respond. At that point, he told Caram that Proctor did not respond to his breakfast call, and from there Caram checked on Proctor.

On this record, there is no evidence that Burch was deliberately indifferent to an objectively serious medical need. Importantly, there is no evidence that Burch was aware that Proctor had taken any drugs, let alone a potentially dangerous combination or quantity of drugs. Similarly, there is no Rule 56 evidence indicating that fellow jailers or inmates told Burch of any concerns related to Proctor's health issues. And Burch himself did not interact with Proctor until she did not respond to his call for breakfast. There is no record evidence which would indicate to Burch that Proctor was experiencing an objectively serious medical need. Accordingly, Burch's decision to alert Caram of the situation and direct her to go into Proctor's cell does not show deliberate indifference to an objectively serious medical need.

Moreover, there is no record evidence which would suggest that Burch subjectively perceived a serious medical need to which he was deliberately indifferent. Burch testified that from his observation Proctor appeared to be sleeping during the night. (Doc. # 44-14 at pp. 53-55). And Plaintiff points to no circumstantial Rule 56 evidence which would otherwise suggest that Burch subjectively perceived a serious medical need.

Finally, Burch is entitled to qualified immunity on Plaintiff's deliberate indifference claim. As addressed above, Plaintiff has presented no evidence that Burch was deliberately indifferent to a serious medical need. Because the Rule 56 record demonstrates that there is no constitutional violation, Burch is entitled to judgment as a matter of law on the basis of qualified immunity.

V.     **Conclusion**

Again, this is a tragic case. Drug overdoses have become too frequent and are a pernicious element of our society. But there is no legal basis for holding Defendants liable for this tragedy. For the reasons explained above, and after careful review, the court concludes

Defendants' motion for summary judgment is due to be granted. A separate order will be entered.

**DONE** and **ORDERED** this June 22, 2017.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE